**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**AMARILLO DIVISION**

| | | |
|---|---|---|
| **ABRAHAM H. CARR, Ph.D., CPA,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 2:25-cv-00272-Z** |
| | § | |
| **WALTER V. WENDLER, et al.,** | § | |
| | § | |
| **Defendants.** | § | |

**PLAINTIFF'S RESPONSE AND BRIEF IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

TO THE HONORABLE COURT:

Plaintiff Abraham H. Carr, Ph.D., CPA hereby files this Response and Brief in Opposition to Defendants' Motion to Dismiss and respectfully shows the Court:

**APPENDIX**

Plaintiff's Response is accompanied by an appendix, a separate self-contained document, in compliance with Local Rule 7.1(i).

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...................................................................................................ii

INDEX OF AUTHORITIES................................................................................... iii-iv

I.   BACKGROUND.................................................................................................. 1

II.  LEGAL STANDARDS ....................................................................................... 2

    A.  Rule 12(b)(1) Motion ................................................................................... 2

    B.  Rule 12(b)(6) Motion ................................................................................... 3

III. ARGUMENT AND AUTHORITIES ................................................................. 3

    A.  Section 1983 Claims ..................................................................................... 3

        1.  Standing against the Board of Regents and the Chancellor ......................... 3

    B.  First Amendment Claim – Retaliation (Count One) .......................................... 4

        1. Carr's Opposition to Drag Shows on the University Campus
Motivated Defendants' Decision or Recommendation
Not to Renew his Employment............................................................... 6

    C.  Right to be Free from Unconstitutional Conditions (Count Two) ...................... 7

    D.  Fourteenth Amendment Claims (Count Three)..................................................... 7

        1. Procedural Due Process .................................................................................. 7

    E.  Equal Protection (Count Five) ......................................................................... 11

    F.  Qualified Immunity........................................................................................ 11

        1. It was Clearly Established that Carr's Speech was Entitled to First
Amendment Protection. ........................................................................ 13

    G.  Breach of Contract (Count Six) ...................................................................... 16

    H.  Title VII Religious Discrimination (Count Seven)............................................. 16

CONCLUSION ........................................................................................................... 17

Certificate of Service .................................................................................................... 18

## INDEX OF AUTHORITIES

**CASES**

*Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*,
    2022 U.S. Dist. LEXIS 43617, *28 (E.D. Tex. 2022) ..................................... 6, 7 14

*Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) .............. 12

*Anderson v. Valdez*, 845 F.3d 580 (5th Cir. 2016) ........................................ 11, 13

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ......................................................... 3

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007) ................................................. 3

*Branton v. City of Dallas*, 272 F.3d 730 (5th Cir. 2001) ......................................... 6

*Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762 (5th Cir. 2019) .............................. 16

*City of Austin v. Paxton*, 943 F.3d 993 (5th Cir. 2019) .......................................... 3

*Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462 (5th Cir. 2014) .................. 13, 14, 15

*Ex parte Young*, 209 U.S. 123 (1908) ................................................................ 3

*Garcetti v. Ceballos*, 547 U.S. 410 (2006) .......................................................... 4

*Harris v. Victoria Indep. Sch. Dist.,* 336 F.3d 343 (5th Cir. 1999) .................................. 15

*Hurst v. Lee Cnty.*, 764 F.3d 480 (5th Cir. 2014) ................................................ 5

*Kinney v. Weaver,* 367 F.3d 337 (5th Cir. 2004) ................................................ 15

*Morgan v. Swanson,* 659 F.3d 359 (5th Cir. 2011) ............................................. 12

*Nelson v. Univ. of Tex.,* 535 F.3d 318 (5th Cir. 2008) .......................................... 4

*Paterson v. Weinberger*, 644 F.2d 521 (5th Cir. 1981) ........................................ 2

*Pickering v. Bd. of Educ.,* 391 U.S. 563 (1968) ........................................... 4, 5, 15

*Planned Parenthood Ass'n of Hidalgo County Tex., Inc. v. Suehs*,
    692 F.3d 343 (5th Cir. 2012) ................................................................ 7

*Ramming v. United States,* 281 F.3d 158 (5th Cir. 2001) (per curiam) ............................... 2

*Rankin v. McPherson*, 483 U.S. 378 (1987) ........................................................ 4

*Ray Mart, Inc. v. Stock Bldg. Supply of Tex. Lp,* 302 F.App'x 232 (5th Cir. 2008)............ 16

*Reichle v. Howards,* 566 U.S. 658 (2012) ........................................................ 12

*Sayre v. Mullins*, 681 S.W.2d 25 (Tex. 1984) ...................................................... 10

*United States Dep't of Justice v. Fed. Labor Relations Auth.*,
    955 F.2d 998 (5th Cir. 1992) ...................................................... 5

**RULES**

Fed. R. Civ. P. 12(b)(6) ........................................................................ 3

## I.    BACKGROUND

In the spring of 2023, a student organization scheduled a drag show on West Texas A&M University's ("WTAMU") campus. Walter Wendler is the President of West Texas A&M University. President Wendler canceled the drag show on the basis that drag shows are "misogynistic" and are "derisive, divisive, and demoralizing." The student organization filed highly publicized litigation in federal court attempting to enjoin President Wendler from banning the drag show. The federal litigation received extensive print and TV media coverage. Later in the spring of 2023, the WTAMU faculty senate held a no-confidence vote against President Wendler after he banned the drag show. All full-time faculty and professional librarians were eligible to vote. A total of 261 ballots were cast, and 69% voted in support of the no-confidence measure.

Plaintiff Abraham Carr ("Carr" or "Dr. Carr") joined the WTAMU faculty in the accounting department in the fall of 2024, after the no-confidence vote was held. Carr is a practicing member of the Church of Jesus Christ of Latter-Day Saints. The LDS Church, and Carr personally, hold traditional views pertaining to sexual identity—views that are antithetical to the content and messaging of drag shows.

One day in the fall of 2024, Carr approached President Wendler, who was being escorted by Amjad Abdullat, the Dean of the Paul and Virginia Engler College of Business, in the hall of the business school to introduce himself. Carr told President Wendler that he respected him for holding true to his values when he canceled the drag show the prior year.

President Wendler responded positively to Carr's words. Dean Abdullat and other business school faculty heard this exchange.

Carr received high ratings for both his teaching and his research in his first semester.

Faculty members convened a meeting in February 2025 to decide whether to renew Carr's appointment. Upon information and belief, a comment was made by at least one decision maker during the discussion on whether to extend Carr's employment that "He [Carr] is just another one of those sexist Mormons." After this meeting, Carr was informed that WTAMU would not renew his faculty appointment for the upcoming academic year.

## II.   LEGAL STANDARDS

### A. Rule 12(b)(1) Motion

Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction can mount either a facial or a factual challenge. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981). When, like here, a party makes a Rule 12(b)(1) motion without presenting any evidence, the challenge to subject-matter jurisdiction is facial. *Id*. In assessing such a challenge, the court looks only at the sufficiency of the allegations in the complaint and assumes them to be true. *Id*. If the allegations are sufficient to establish jurisdiction, the complaint stands. *Id*. Because the "burden of proof for a Rule 12(b)(1) motion to dismiss is on the party asserting jurisdiction," the "plaintiff constantly bears the burden of proof that jurisdiction does in fact exist." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001) (per curiam).

2

### B.  Rule 12(b)(6) Motion

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, a complaint must provide "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Supreme Court has instructed that plausibility means "more than a sheer possibility," but not necessarily a probability. *Id. at* 678.

### III.    ARGUMENT & AUTHORITIES

### A.  Section 1983 Claims

#### 1.  *Standing against the Board of Regents and the Chancellor*

Carr seeks injunctive relief against Glenn Hegar, in his official capacity as the Chancellor of the Texas A&M University System, and the Texas A&M University System Board of Regents, also in their official capacities (the "A&M System Defendants").

Sovereign immunity prevents plaintiffs from suing a nonconsenting state in federal court unless the state has waived sovereign immunity or Congress has expressly abrogated it. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). But as with most general rules, this one has an exception: *Ex parte Young*, 209 U.S. 123, (1908). The *Ex parte Young* exception to sovereign immunity is based on a legal fiction that allows a private party to bring a suit for prospective, injunctive relief against state officials. *City of Austin*, 943 F.3d at 997-98. Whether a suit may proceed under *Ex parte Young* does "not require an analysis

3

of the merits of the claim." *Id.* at 998. Instead, "a court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Id*. at 998 (cleaned up) (*quoting Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247 (2011)).

Carr's official-capacity claims seek prospective, injunctive relief against the university officials. As such, those claims must survive. In his complaint, Carr requests an injunction requiring the university officials to reinstate him as a faculty member in WTAMU's Accounting, Economics, and Finance department. ECF No. 3 at ¶ 106. This request for reinstatement is the sort of prospective, equitable relief that falls within the *Ex parte Young* exception to sovereign immunity. *See Nelson v. Univ. of Tex.,* 535 F.3d 318, 324 (5th Cir. 2008). Thus, Carr's Section 1983 claims for prospective, injunctive relief against the university officials in their official capacities are not subject to dismissal under Rule 12(b)(1) based on sovereign immunity. And because an injunction would be enforceable against these defendants in their official capacities, Carr has standing to bring suit against them.

## B. First Amendment Claim – Retaliation (Count One)

Public employees do not surrender all First Amendment rights because of their employment. *Garcetti v. Ceballos*, 547 U.S. 410, 417 (2006); *see also Pickering v. Bd. of Educ.,* 391 U.S. 563, 568 (1968) (collecting cases). If employee expression touches on a matter of public concern, the First Amendment prohibits the government from taking an adverse employment action against the employee for such expression without sufficient justification. *Rankin v. McPherson*, 483 U.S. 378, 387 (1987).

4

Carr was a public university professor, and therefore a public employee, at the time of the challenged conduct. Courts use a four-pronged test to determine whether a public employee's speech is "entitled to constitutional protection from employer discipline." *Hurst v. Lee Cnty.*, 764 F.3d 480, 484 (5th Cir. 2014). To state a claim that the university officials retaliated against him for exercising his right to free speech, Carr must show that "(1) he suffered an adverse employment decision; (2) his speech involved a matter of public concern; (3) his interest in speaking outweighed the governmental defendant's interest in promoting efficiency; and (4) the protected speech motivated [WTAMU's] conduct." *Id.* (*quoting Juarez v. Aguilar*, 666 F.3d 325, 332 (5th Cir. 2011)).

Defendants challenge only the second and fourth elements. Carr has pleaded sufficient facts to demonstrate that the issue of public universities hosting drag shows is a matter of public concern, and that Carr's support of President Wendler and, therefore, his opposition to drag shows on university campuses (contrary to the opinions of the majority of WTAMU faculty) was a motivating factor to his non-renewal of employment. Carr's opposition to drag shows on the University campus was a matter of public concern.

In *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the Supreme Court held that the First Amendment protects the rights of public employees "as citizens to comment on matters of public interest in connection with the operation of" their workplaces. In order to establish a First Amendment claim based on such speech, a public employee must "establish that his speech involves a matter of public concern." *United States Dep't of Justice v. Fed. Labor Relations Auth.*, 955 F.2d 998, 1005-06 (5th Cir. 1992) (*citing Coughlin v. Lee*, 946 F.2d 1152, 1154 (5th Cir. 1991)). "Whether speech addresses

5

a matter of public concern is to be determined by the content, form, and context of a given statement." *Id.* (*quoting Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). The Supreme Court has further clarified that "[m]atters of public concern are those which can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Branton v. City of Dallas*, 272 F.3d 730, 739 (5th Cir. 2001) (*quoting Connick v. Myers*, 461 U.S. 138, 146 (1982)).

Carr's speech in support of President Wendler and the reasons for his decision to cancel the on-campus drag show related to matters of political, social, or other concern to the community. *See, id.* The content of Carr's speech (essentially opposition to on-campus drag shows) had nothing to do with his job as a member of the business school faculty or his teaching responsibilities. Instead, he expressed an opinion as it related to an issue that was receiving notable attention in the public forum. Therefore, the Court should hold that Carr's speech addressed a matter of public concern. *Accord Hiers v. Bd. of Regents of the Univ. of N. Tex. Sys.*, 2022 U.S. Dist. LEXIS 43617, *28 (E.D. Tex. 2022) (University professor's chalkboard message characterizing flyers related to "microaggressions" constituted a matter of public concern).

1. *Carr's Opposition to Drag Shows on the University Campus Motivated Defendants' Decision or Recommendation Not to Renew his Employment.*

Carr has plausibly pled that his protected speech, which amounted to support for President Wendler and his opposition to on-campus drag shows, motivated the university officials' decision or recommendation not to renew his employment. The WTAMU faculty overwhelmingly issued a no-confidence vote against President Wendler because of the

position he took against on-campus drag shows. When Carr expressed support for President Wendler's actions and his moral convictions, Carr stood in opposition to the majority of his fellow faculty members. The comment about Carr being a "sexist Mormon" plausibly relates to his opposition to drag shows. Because that comment was made in connection with the meeting during which the decision was made not to renew Carr's faculty appointment, a rational juror could find that the university officials' decision or recommendation not to renew Carr's faculty appointment was motivated by his protected speech. Carr has stated a plausible claim for the violation of his First Amendment rights, so the Court should deny the Motion to Dismiss.

### C. Right to be Free from Unconstitutional Conditions (Count Two)

Defendants do not attack Count Two of the Complaint, which asserts a violation of Carr's right to be free from unconstitutional conditions. *See Planned Parenthood Ass'n of Hidalgo County Tex., Inc. v. Suehs*, 692 F.3d 343, 348-349 (5th Cir. 2012). As such, as to this claim, the Motion to Dismiss must be denied. *See Hiers,* 2022 U.S. Dist. LEXIS 43617, at *35.

### D. Fourteenth Amendment Claims (Count Three)

#### 1. Procedural Due Process

As discussed in greater detail below at Section III.G, WTAMU offered, in writing, and Carr accepted, an offer of employment with a contemplated term of three years. The offer also expressly incorporated the "Texas A&M University system Board of Regents policies that may lead to consideration for promotion and tenure" and the "faculty handbook." ECF 6-1, MTD APPX 00190.

The handbook, which was referenced in the employment offer, contains various due process protections for non-tenured faculty members.[1] For example, they "may appeal the decision of the Executive Vice President and Provost for Academic Affairs on the basis that the decision was made in violation of the academic freedom of the individual or for an illegal reason or for inadequate consideration of the faculty member's record of professional achievement." CARR APPX. 66-67. The handbook also governs termination of employment, identifying four conditions that "constitute cause for dismissal." They are 1) professional incompetence; 2) neglect of professional responsibilities; 3) moral turpitude, and 4) sexual harassment. CARR APPX. 40. None of these conditions apply to Carr.

The most pertinent provisions of the handbook relate to a faculty member's right to appeal a decision of non-renewal. On March 2, 2025, Dr. Carr submitted his appeal to President Wendler. CARR APPX. 158-162. On March 8, Dr. Neil Terry, Executive Vice President and Provost, emailed Dr. Carr directing that he "stop contacting President Wendler," in direct contravention to the appeal procedure, claiming that he had not followed Dr. Terry's directions in initiating the appeal. CARR APPX. 163-164. On March 12, Dr. Terry provided a memorandum regarding "Response to Appeal," by which he purported, without authority, to deny the appeal. CARR APPX. 165-166.

---

[1] The Faculty Handbook attached to Defendants' Motion to Dismiss was effective as of September 18, 2025, after Carr's departure and is therefore wholly irrelevant to the motion under consideration. The faculty handbook in effect during the relevant time period is attached to Plaintiff's Appendix in support of this Response as CARR APPX. 1-157.

According to Section III.A.2.b., rights of notification of non-renewal and terminal appointments are governed by section III.C.6. and 7 of the Handbook. CARR APPX. 30. The Handbook governs non-renewal for faculty members designated as either "temporary" or "probationary" in their letters of appointment. CARR APPX. 39.

The Handbook's "rules and procedures on Promotion and Tenure of faculty at West Texas A&M University apply to all tenure-track faculty members of the University." CARR APPX. 52. The Handbook clearly states that the appeal procedure applicable to tenure-track faculty members subject to a decision of non-renewal "**is outlined in Section 8**." (emphasis added). CARR APPX. 57. Sections 8.2-8.3 require that notification of the appeal "must be filed with the president" who "shall refer the appeal to a committee of three faculty members chosen at random by the Faculty Senate President from the pool of members of the University's Faculty Grievance Committee." CARR APPX. 67. It is then up to the committee to make a determination as to whether the faculty member has made a *prima facie* case that the non-renewal decision was improper under one of three applicable tests. If such a determination is made, the faculty member is entitled to an evidentiary hearing. *Id*.

Via memorandum dated April 2, 2025, the Preliminary Review Committee unanimously determined that Dr. Carr had established a *prima facie* case that the non-renewal decision was made in violation of his academic freedom and without adequate consideration of his professional achievement. CARR APPX. 167.

Once the Preliminary Review Committee concluded that Dr. Carr had made a *prima facie* showing that a violation occurred, Section 8.4 of the Handbook required that an

evidentiary hearing be conducted, during which Dr. Carr would have had the burden of proving that the non-renewal decision was made in violation of academic freedom, or for an illegal reason, or without adequate consideration of his record of professional achievement. CARR APPX. 67. The same Section provides that Dr. Carr had "the right of representation at this hearing." *Id*. This is consistent with Texas law, which affords the right to counsel to public employees pursuing grievances. *See Sayre v. Mullins*, 681 S.W.2d 25, 28 (Tex. 1984). Dr. Carr was not afforded the right of representation at the first hearing.

Instead, on May 1, 2025, President Wendler disseminated a memorandum explaining that the "Evidentiary Hearing Committee met for the purpose of reviewing [Dr. Carr's] appeal regarding the non-renewal of [his] contract." ECF 6-1, MTD APPX. 00202. President Wendler explained that the committee had determined the non-renewal decision was not made in violation of academic freedom, for an illegal reason, or without adequate consideration of Dr. Carr's record of professional achievement. *Id.* President Wendler offered no explanation as to why Dr. Carr was not informed of the evidentiary hearing and was denied the opportunity to participate, along with his chosen representative.

On May 28, counsel for Carr corresponded with President Wendler detailing the various ways in which WTAMU had violated its own policies, breached its agreement with Dr. Carr, and demanded that the required evidentiary hearing be scheduled, or else litigation would be initiated. ECF 6-1, MTD APPX 203-205. Only when faced with the threat of a lawsuit did WTAMU capitulate and agree to the required evidentiary hearing, which took place on July 30, 2025.

The initial denial of Carr's appeal without the requisite hearing, along with representation by counsel, constituted a denial of the very due process protections baked in to the Handbook. Carr incurred attorney's fees as part of the effort by his counsel to require the University to follow its own policies. Although the appropriate evidentiary hearing was convened later, it cannot be said to have fully cured the insult occasioned by initial denial and accompanying cost to Dr. Carr.

### E. Equal Protection (Count Five)

Plaintiff withdraws Count Five of his Complaint.

### F. Qualified Immunity

Carr has plausibly alleged a claim for a First Amendment violation. The Court should similarly hold that Carr's First Amendment rights were clearly established at the time and deny the individual Defendant's qualified immunity.

Qualified immunity is a court-created doctrine that limits when state officials may be sued in their individual capacities for alleged constitutional violations. A plaintiff seeking to defeat qualified immunity must show (1) that the official violated a statutory or constitutional right and (2) that the asserted right was "clearly established" at the time of the challenged conduct. *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016). At the Rule 12(b)(6) stage, "the facts alleged must be taken in the light most favorable to the party asserting the injury." *Id.* (cleaned up). Carr has met the first prong at this stage, so the Court proceeds to the second.

At the second step, a plaintiff must show that the contours of the asserted right are "sufficiently clear that every reasonable official would have understood that what he is

11

doing violates that right." *Reichle v. Howards,* 566 U.S. 658, 664 (2012) (cleaned up). Because this standard protects all but the plainly incompetent or those who knowingly violate the law, courts do not deny immunity unless existing precedent placed the constitutional or statutory question "beyond debate." *Morgan v. Swanson,* 659 F.3d 359, 371 (5th Cir. 2011) (en banc) (quotation omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted).

To be clearly established, ordinarily a preexisting Supreme Court or Fifth Circuit decision, or the weight of authority from other circuits, must make it apparent to reasonable state officials that their conduct is unlawful. *Morgan,* 659 F.3d at 371-72. At the same time, neither the Supreme Court nor the Fifth Circuit has ever required "the very action in question" to have "previously been held unlawful," *Anderson,* 483 U.S. at 640. That's because the central concept behind qualified immunity is that of "fair warning." *Anderson,* 845 F.3d at 600 (quotation omitted). Thus, the "law can be clearly established despite notable factual distinctions between the precedents relied on and the cases then before the Court, so long as the prior decisions gave reasonable warning that the conduct then at issue violated constitutional rights." *Id.* (quotation omitted). With these principles in mind, the Court should hold that Carr's First Amendment rights were clearly established at the time of the challenged conduct (i.e., Spring 2025).

1. *It was Clearly Established that Carr's Speech was Entitled to First Amendment Protection.*

The Fifth Circuit has recognized that, by at least 2014, "it was clearly established that an employee's speech made 'externally' concerning 'an event that was not within [his or her] job requirements' was entitled to First Amendment protection." *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016) (*quoting Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 472-73 (5th Cir. 2014) (holding that by 2010, the combination of case law had resulted in clearly established law).

In *Cutler v. Stephen F. Austin State University*, Cutler, a university employee, made critical comments about Representative Louie Gohmert to one of Gohmert's staff members. *Cutler*, 767 F.3d at 466. Cutler's comments were not related to his job requirements as the university's Director of Art Galleries. *See, id.* After Rep. Gohmert expressed disappointment in response to Cutler's speech, he informed university officials of the incident. *See id.* at 466-67. Cutler was eventually forced to resign by the university. *See id.* at 467.

In evaluating the defendant's qualified immunity defense, the court noted that Cutler's speech was made externally and was about participating in an event that was not within his job requirements. *Id.* at 473. The court further noted that Cutler "spoke about concerns unrelated to his job and from a perspective that did not depend on his job as a university employee, but rather emanated from his views as a citizen." *Id.* Based on these facts, the Fifth Circuit held in 2014 that reasonable officials in the defendants' position should have known, based on existing legal authority, that Cutler's speech was protected

13

as the speech of a citizen and that their decision to terminate Cutler on the basis of that speech would violate Cutler's First Amendment rights. *Id.*

The facts of *Cutler* are sufficiently similar to those here to have given the university officials "fair warning" that terminating Carr's employment because of his protected speech would violate his First Amendment rights. Although Carr's speech in support of President Wendler (and—by extension—Carr's opposition to drag show performances on university campuses based on religious grounds) physically took place on campus, the speech was nonetheless "external" in that it was wholly unrelated to his employment as a member of the accounting faculty. In other words, Carr's speech in support of opposing drag shows on campus emanated from his views as a citizen.

Defendants attempt to shoehorn Carr's speech into his job performance by relating it to the faculty vote of no-confidence. But Carr did not participate in the faculty vote. It was held before he was employed by the university. He also made his comments to President Wendler in the hallway of the business school, in front of Dean Abdullat and other faculty, not at a faculty meeting. Carr offered his remarks to President Wendler as a word of encouragement from someone with likeminded views regarding drag shows; the fact that Carr's speech took place on a university campus does not *de facto* intertwine his speech to the performance of his employment by the university. *See Hiers*, 2022 U.S. Dist. LEXIS 43617, at *28 (protected speech took place in a faculty lounge, rather than in a classroom or before a captive audience of students). Given this context, Carr's speech was unrelated to any of his duties as a faculty member.

14

The university officials contend that government officials are rarely denied immunity from liability arising out of First Amendment disputes because of the *Pickering* balancing required in such cases. However, there is no true balancing required because the university officials do not set forth any substantial legitimate interest. *Kinney v. Weaver,* 367 F.3d 337, 371 n.1 (5th Cir. 2004). The Defendants assert that the rational basis for the non-renewal decision was Carr's lack of "fitness with colleagues." ECF No. 6 at 10. But this was not the reason initially advanced by the University. Instead, Drs. Babb and King said their "decision reflects Dr. Carr's misalignment with the expectations, norms, and standards of the discipline, department, and college." ECF No. 6-1, MTD APPX 191. This explanation, if one can call it that, is so vague and non-specific that it is impossible to identify any legitimate interest the University may have had in making the decision. Because the university officials in this case have not offered "any relevant, legitimate interests to put on their side of the *Pickering* scales," it is "entirely appropriate to deny qualified immunity" at this stage. *Id.* at 372; *see also Harris v. Victoria Indep. Sch. Dist.,* 336 F.3d 343, 345 (5th Cir. 1999) (per curiam) (collecting cases holding that qualified immunity is unavailable when there is no governmental interest to balance).

Therefore, in light of *Cutler* and related case law, reasonable officials in the university officials' shoes would have known that Carr's speech touched on a matter of public concern and that discontinuing his employment because of his speech violated the First Amendment. Accordingly, the university officials are not entitled to qualified immunity on Carr's retaliation claim.

## G. Breach of Contract (Count Six)

WTAMU's November 17, 2023 offer of employment to Carr constitutes an enforceable contract. The offer contained an appointment for the Fall of 2024 and explained that the "position also consists of the following **three-year** faculty development support and start-up package" (emphasis added) by which funds, in addition to Carr's base salary, were earmarked for academic years 2024 through 2027. ECF 6-1, MTD APPX 00190. The offer contemplates an employment term of three academic years. As such, it constitutes, as an exception to the at-will nature of most employment relationships in Texas, an enforceable agreement. *See Ray Mart, Inc. v. Stock Bldg. Supply of Tex. Lp,* 302 F.App'x 232 (5th Cir. 2008) ("The Employment Agreement indicates that both Stock and Vybiral anticipated that Vybiral would work at Stock for at least three years.") As such, the Court should deny dismissal of Carr's breach of contract claim.

## H. Title VII Religious Discrimination (Count Seven)

The Court should deny Defendants' Motion to Dismiss Carr's claim for religious discrimination against WTAMU[2] under Title VII because Carr sufficiently alleges that he suffered disparate treatment by WTAMU due to his membership in the Church of Jesus Christ of Latter-Day Saints. There are two ultimate elements a plaintiff must plead to support a disparate treatment claim under Title VII: (1) an "adverse employment action" (2) taken against a plaintiff "because of [his] protected status." *Cicalese v. Univ. of Tex. Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019).

---

[2] Plaintiff withdraws his title VII discrimination claims against the individual defendants, but not as to WTAMU.

Carr suffered an adverse employment action (*i.e.*, non-renewal of his faculty appointment). He has also plausibly pleaded that the university officials terminated his employment because of his religious beliefs (*i.e.*, his membership in the Church of Jesus Christ of Latter-Day Saints). Carr is a member of the LDS Church, which holds culturally traditional views regarding sexual identity. The LDS Church generally—and Carr specifically—support traditional views of sexuality that are incongruent with drag shows and the views represented by them.

During WTAMU faculty discussions regarding the decision to non-renew Carr's faculty appointment, a comment was made that "He [Carr] is just another one of those sexist Mormons." That this comment was made in relation to the discussion during which WTAMU leadership voted not to renew Carr's employment, a rational juror could plausibly conclude that WTAMU non-renewed Carr's employment because of his religious beliefs and convictions—especially in light of the ongoing controversy regarding drag shows on campus.

## CONCLUSION

The Court should deny Defendants' Motion to Dismiss consistent with the arguments articulated above.

Respectfully submitted,

**YOUNG FIRM PC**

By: */s/ Jeremi K. Young*
Jeremi K. Young, TX SBN 24013793
301 S. Polk St., Suite 320
Amarillo, Texas 79101
Tel: (806) 331-1800
Fax: (806) 398-9095
Email:  jyoung@youngfirm.com

**ATTORNEY FOR PLAINTIFF**

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that, on the 10th day of April, 2026, the foregoing document was electronically transmitted to the Clerk of the Court for filing via the Court's ECF System, and service of Notice of Electronic Filing was made to the ECF registrants shown below:

Stephanie A. Criscione Houser
Assistant Attorney General
Office of the Attorney General
P. O. Box 12548 Capitol Station
Austin, Texas 78711-25848
Email: Stephanie.Criscione@oag.texas.gov

**Lead Counsel for Defendants**

By: /s/ Jeremi K. Young
Jeremi K. Young

18